Okay, the first argued case this morning is En Re Magnum Oil Tools International, number 15-1300. Mr. St. Clair. Good morning, Your Honors. My name is Nathaniel St. Clair. I'm here on behalf of Magnum Oil Tools of Corpus Christi, Texas, the appellant. I have three points that I'd like to cover. The first of which being the petitioner failed to prove obviousness of the 413 patent when it used the Lear application as its primary reference. Because of that failure, the board was forced to employ an alternate theory of obviousness in order to fill in some of the missing claim elements, which were never proposed by the petitioner. The second of which being the Lear reference itself actually teaches away from the proposed combination set forth by the board, and this just caused the board to reach an incorrect Lear conclusion. The last of which of those points would be the petitioner failed to meet his burden. The petitioner provided no explanation of how the three references are combined and relied solely on conclusory statements. So get into that first point. The petitioner failed to prove obviousness of the 413 when he used the Lear reference as the primary reference along with the Cockrell and Christensen references. As a result of that failure in proving obviousness, the board was forced to use an alternate theory of obviousness, a theory that was never proposed by the petitioner in any of its IPR petition, and the board used that to fill in some of the missing claim elements in its decision. Are you saying that the case can't develop further after the point of the initiation? No. We're not attempting to appeal the initiation. We're actually saying that they didn't carry – the prima facie case, you know, if that was shown, then they can initiate, obviously. What we're appealing is the final decision, the final decision based on the fact that going from that point on, the petitioner did not carry their burden all the way through the final decision. The Drinkware case, the Stratoflex cases, all of those cases teach that even though the IPR is initiated, it's the petitioner's burden to show obviousness all the way through until final decision. Well, clearly. Clearly. There's no shifting of burden. There's no question about whether they have the burden to establish obviousness. My question to you is whether you are saying that if they rely on a particular ground in their petition, that that's frozen in time, that there can be no further development during the course of the case and the proceeding with respect to the nuances of the theory. No. I don't believe it's frozen in time, Your Honor, but the point that we are making is that what the board actually relied on is something that was never actually in evidence. And going from there and even step beyond that, what they actually relied on is factually incorrect. The Lear reference itself teaches away from the very proposed combination that the board relied on in making their final decision. Let's drill down a little bit. Sure. A lot of known ways in the art of downhole plugs to attach a setting tool to the plug, right? And shearable threads was one way to do it. And that was known. And I guess Lear teaches that notion. And so the point of the board's analysis for the 103 is because there are multiple known ways in this downhole plug art to attach a setting tool to a plug, it would be obvious to use one over another. And one of the known methods, as shown by Lear, is using shearing threads, which is what you've claimed. So where's the defect in that? Well, if you let me take a step back. Lear actually teaches using a deformable disk. And the deformable disk is attached to the mandrel. Oh, I'm sorry. Cockrell. Cockrell teaches the shearable threads. Right. Cockrell discusses using shear threads. However, what the board proposed is basically taking the deformable disk of Lear, which is, if you can imagine, a compact disk, and that is deformed as a plunger is pulled through the downhole tool to create this release. What the board is suggesting is you take this, what the Lear reference teaches is something that is fairly flat in nature, and put threads on the inside of it. The Lear reference itself in paragraphs 10, 11, 13, and 44 actually teach reasons why you don't want to take Lear and either attach it with something that will fall downhole, which will be disadvantageous creating debris in the well bore, and it discusses that it's undesirable to drill into the downhole tool. The Lear reference itself actually teaches a way from the suggestion that the board has created. Specifically, the Lear reference talks about this deformable disk, this CD, if we use that. This disk is attached to the mandrel by retention pins. In this art, in the downhole tool art, if you're using retention pins, it's specifically for a reason. A skilled artisan would know and understand that these retention pins are there to prevent the very thing that the board is suggesting, something shearing off, falling downhole. You had two prongs to your argument here. One is you said that this information that the board relied upon or inferred or implied or found was not actually in evidence. Right. This was not the petitioner's proposed argument. The way this actually got into their final decision, the board referenced back to one of the references that grounds weren't even initiated on, the alpha reference. In the final decision, the alpha reference was not one of the references under which the board initiated the review. Who raised the alpha reference and the others? How did all of these references that you say should not have been relied upon get into the system? The alpha reference was one of the 20 proposed invalidity grounds that was in the original petition. Were they in the petition so they were argued by the petitioner? It was in the original petition. The board initiated a review on six of those grounds, none of which had anything to do with alpha. Okay. And when the board got to final decision, the three references that were discussed in this final decision were the Lear reference, the Cockrell reference, and the Christensen reference. Even in its final decision, the board and the petitioner, I'm sorry, even throughout the petition, the petitioner is making arguments saying everything based on alpha would have been possible with Lear, so let's incorporate those arguments in by reference. But nowhere in its arguments did the petitioner actually show these missing elements or how one of skill and the art would have made this proposed combination. They attempted to employ somewhat of a mental shortcut and say take alpha, which the board didn't initiate on, and let's plug in Lear. And let's say everything with Lear and alpha is the same. The problem with that is it's not. The tools, alpha and Lear, are so dissimilar in not only their setting tools, their sharing mechanism, that you cannot take a simple substitution of alpha, which is not even in the case, and place Lear in that place. When you say it's not in the case, but you said that it was cited in the petition. It was originally cited. I'm sorry, Your Honor. Well, why is it not in the case? It's not one of the grounds in which the review was granted. It was one of those originally proposed, but it was not one of the six grounds under which the board initiated. But that takes us back to the question of whether, in fact, after initiation that ends the premises on which the case can proceed. And I thought your answer to Judge O'Malley was that you didn't think so. No, I believe it can proceed. It proceeds on the grounds in which review was initiated. Only? Yes. But see, the board's position is that even if it's not initiated solely on alpha grounds, that doesn't mean alpha is irrelevant in terms of the art that exists and that the board is supposed to consider. And even taking so, if that is the case, Your Honor, if we take that as the premise, nowhere from that point on, once review has been initiated, did we take the Lear reference and show how that same argument actually does apply from alpha to Lear. And that's the problem. So you're saying that this is a situation in which the petitioner did not present any evidence, did not address the question, did not have testimony regarding alpha? Right. The only arguments that they have are conclusory statements by Gary Woolley saying that these are the same and it would have been done in that same way. When addressed with why one skill of the art would take the Lear reference, where it has at least four times saying we would not do this in this way, we would not have retention pans becoming sheer pans because it's disadvantageous, we would not drill into it creating the same thing that the board is citing to, they just glossed over it. And it was never actually addressed in those conclusions made by Gary Woolley. Well, I mean, the alpha reference is and is not part of the rejection. It's not officially part of the rejection, but in terms of the reasoning for combining the elements, the board said look over here at this reasoning for possibly combining alpha with these secondary references and that kind of reasoning applies equally to using Lear as the primary reference. So now let's go to that question where the board seemed to be pointing to what the petitioner said that one skill of the art would be motivated to substitute alpha's sheer ring for Lear's deformable device. And so by extension the board is saying likewise one would be motivated to substitute Lear's deformable device and swap it out with Cockrell's sheering threads. Now aside from your teaching away argument, I understand that argument. Why aren't those two things interchangeable and equivalent? Why aren't what Lear and alpha teaches? No, what, I'm sorry, Lear's deformable release device and Cockrell's sheering threads. Why aren't those two equivalent and interchangeable so that one in skill in the art would know how to substitute one for the other? Well, in alpha the entire point is there being some breakage of some sort. What Lear actually tells us is that we want this to be retained because the plunger in Lear is asserted up hold before it actually goes down into down hold tool. If we put in a device such as what alpha is suggesting, the entire operation of it would be different. The other thing that makes it different is the alpha tool I believe is run on a wire line setting tool as opposed to what's taught in the patented art. Anne and Lear are actually run on separate mechanical setting tools. I'm sorry, forget about alpha for a second. Just let's focus on Lear and Cockrell. Cockrell has the sheering threads. Lear has the releasable deformable device. Why wouldn't someone think that those two things are interchangeable? Well, Lear would actually require a complete redesign in order to make a place to put the sheering thread cylinder within the actual mandrel. The way Lear is designed, the retention device is actually external. Is it your view that the board's reasoning was, well, you wouldn't remove Lear's deformable device. What you would actually do is adapt it. You would modify that very device, what you call a CD, by putting internal threads on it and external threads on it. Therefore, you would now have something that matches your claim limitation. Right, and it would be a complete redesign. If we go that far and say we're taking Lear, we're adding girth to it to allow it to retain threads, and then we're also moving it from being external to what is now Lear to being internal to what is the patent invention, it would be a complete redesign, and one of skill in the art at the time of this invention would not have made that conclusion. And we provided technical explanation by Kevin Trahan, 20 years of experience, that actually cited that same thing that has designed these tools for 30 years, because what the board has essentially done is taken a packer, which is completely different than a frack plug. They're both used in downhole operations and attempted to adapt one to perform the function of the other. Now, Mr. Stankley, where is McClinton in this appeal? Where is the prevailing party in defending the decision in their favor? The prevailing party sat on the sidelines. We had some district court litigation in the southern district of Texas before Judge Ramos. We received an injunction in that case and a favorable settlement, and once that went away, they stepped aside. So where is the controversy? What happens depending on who wins this appeal? Does anything change? Other than the fact that my client would perhaps lose their patent. Where is the controversy, the judicial controversy, that invokes federal jurisdiction? Well, right now it's whether or not the petitioner met their burden. Who do you have a controversy with? In this place now it would be the intervener. How did that happen? This was an inter-parties debate between yourself, the petitioner raised the issue, you responded, there was an adjudication. The prevailing party has disappeared from this case. Yes, and the petitioner, the intervener stepped in and the petitioner sued. I shall ask the intervener if they're representing the government or if they're representing your opponent. The government. We'll save you rebuttal time because that's the first question I want to ask Ms. Seward on behalf of the government. Thank you. Thank you, Mr. St. Clair. Yes, where is the appellee in this case? Where is the case of controversy? The appellee in this case is the government and we represent the board. Speak up a little, please. I'm sorry. Speak up a little. We represent the director as the appellee. The director was the losing party or the prevailing party? I thought the director was adjudicating this controversy. That's correct, Your Honor. If we have an appeal from the district court and the prevailing party decides not to defend the appeal, we have never had a case where the district judge has said, never mind, I'm going to appeal and support my decision. Yes, Your Honor, but the director has the right to intervene in an IPR by statute. Exactly, and we're very interested in what the director has to say about matters of law. Very interested, but you're not saying that. You're defending the adjudicator is now coming in to defend your decision. That's quite curious in the federal system. Well, Your Honor, we view our rationale for being here is to protect the public. In our view, a patent issued erroneously because it would have been obvious, and so now the patent owner has lost at the board, and our job now is to prevent the patent owner from regaining their patent because this invention or what's claimed should be out in the public for free use of the public. So the director will always intervene on the side of eliminating the patent? Depending on what the board's decision is. Of course, if the board decides that in an IPR that the claims were not unpatentable, the petitioner can appeal that. I would assume a patent owner would not show up to this court at that point, but there could be a possibility that the PTO would come and defend the board's decision that yes, the patent owner is rightfully entitled to this patent. That's unusual. Whether it's appropriate is an interesting question because it seems to contradict the Constitution and every obligation of the federal courts to have a case of actual controversy. There's always a public interest in getting the right answer in adjudication, and yet we have never seen a case where the public interest we have, and of course, there are always interveners. There are friends of the court expressing a viewpoint as to how the public is affected, and we appreciate that the statute authorizes the director to intervene. Presumably, I think was the intention, we would be interested in your viewpoint in order to discuss the law, which is being involved, not to discuss the facts, the equities, the merits of the particular case as between these two protagonists, one of whom apparently they've come to terms, makes not the slightest difference to anybody how this case is decided. You talk about intervention and the right to intervene. Clearly, that exists by statute, but the question becomes, but you understand that the PTO couldn't appeal on its own. Correct. So if you have a situation in which there is no opposing party, does the PTO's right to intervention allow them to step into the shoes of the opposing party, or is the right to intervention solely to allow the PTO to be a third party to the proceeding and a pure intervener, and you have to presuppose that there is otherwise a case of controversy that is ongoing? I believe that we step into the shoes, but honestly, Your Honor, the PTO's position I can't speak to. I'm happy to go back to the PTO and get the director's official position on the interpretation of the intervention statute and submit a letter to the court if you would like that. Well, because to wrap this up, let's say that the PTAB had decided in favor of this patent and had sustained it, overruling the board. Is your position or your reserving comment that the director, if the other side doesn't appeal, could come in and say that my board got it wrong? No. So it's only if the patent runs the risk of being sustained by this court that the director can intervene? I believe the situation is the same as in inter-parties re-examination. The solicitor's office has come here representing the director in both cases where the patentee lost the patent and in cases where the patentee retained the patent. So we've been in situations where we've defended the board's upholding of a patent and we've defended the board's final conclusion that a patent was unpatentable. Even when there's no controversy, we're told it makes not the slightest difference anymore to these parties. They've settled. That's why the prevailing party isn't squandering any more funds on this litigation. Yes, Your Honor. Again, we view our position here as protecting the public against a claimed invention that should be in the public domain. So you'll come in only when there's a risk that the patent will be sustained on appeal? I don't think that's correct, but again— That's what we have now. We have a petition. Yes, that's what we have. The other side won. It doesn't care. But you care. We care. That's my question. We care. That's very interesting. I think judges always care about their result being sustained on appeal. But this would be very interesting if from now on any judge who wants to make sure that the appellate tribunal gets it right comes in as a party. Well, all right. You see the issue that concerns us. I think we need to— My understanding is the solicitor's office has always, as a default practice, defended a patent board decision whenever the prevailing party below drops out of the case, whether the patent is found ultimately patentable or unpatentable. That has been our default practice, like I said, That was the case in the prior system before we developed this adjudicatory body in the office. I agree. When it was just simply an appeal to the whatever was called then. Okay. Before we get to the merits, can I just ask a slightly different process question? And this is the one that I was curious about from the beginning when I saw that there was no opposing party. Assuming that we disagree with your position and that we either find that the board applied the wrong obviousness standard or we find that the facts that the board found were not supported by evidence in the record and we then vacate and remand, would the PTO continue the IPR under those circumstances? I looked at the PTO's own rules and it talks about when it would or wouldn't continue. And one of the times when it says that it will continue the IPR is when it's very close to a decision or it's already begun rendering its decision. But if it's essentially right after initiation, it wouldn't continue. In this circumstance, you'd be starting over. So would the PTO continue or could it continue? Right now, there are no rules as to what happens when a case comes back from the federal circuit. The reason for that is the board wanted to maintain maximum discretion and address each case on its own. In the future, there may be rules depending on how the practice plays out. But I can't speak to what would happen in this case when it goes back if the petitioner has dropped out. The board may view its role again as protecting the public against the patent that should have never issued. Or it may decide that the petitioner has dropped out and there's no reason to continue as it does before the final written decision has been issued. But I can't speak for the board in this particular case. Because there are no rules forcing the board to do one thing or the other. Okay. Okay, please proceed with the merits. May it please the court. The prima facie case of obviousness, all the elements are clearly found in the record in this case. If we start with all the claim limitations, again, those are found in the record at A403-404. That's the institution decision. Can you point us to where in the three references do any of them teach an insert that's threaded or screwed into the body of a plug that also has shearable threads disposed around its inner surface? Cockrell teaches an insert. In Cockrell, there's a mandrel in the center and it teaches a sleeve which is inserted onto the mandrel. And the threads on the interior part of that sleeve are shearable. Which element are you pointing to in Cockrell? The insert is release member 136. And is this what the board pointed to as being the insert that gets screwed into the body of a plug that has shearable threads on the internal surface? The board agreed with the claim chart that Dr. Woolley submitted as part of the petition. And the claim chart is at A288-A298. So the insert element starts at A290. And it was the positioner's position, and the board agreed, that Lear discloses a deformable release device as an insert. Of course that doesn't have threads, but it is an insert. So then, to get it straight here, the board did not rely on Cockrell's frangible release member 136 to be the claimed insert. It relied on the deformable release device 30 of Lear to be the claimed insert. Well, actually, all three prior art references teach inserts. Well, I'm trying to get to the bottom of what was the board's reasoning. And I guess you're telling me that the board relied on the Lear deformable release device 30 to correspond to the claimed insert. The board relied on the claim chart. It agreed with the claim chart in full. So I believe that it's fair to say that the board relied on all three references to teach an insert. Okay, where does the claim chart point me to frangible release number 136 as corresponding to the claimed insert? This is at page 2, A291. At the end of the, the very bottom of the box. It says, third, Cockrell teaches a shearable insert that is screwed into a body. And then it quotes a frangible release number 136. Now, when we get back to the board's decision, it talks about substituting shearing threads for the retaining pins. That I didn't follow. So, the board, if we look at the institution decision, the board made two comments about the motivation to combine Lear with Cockrell. The first statement is at A404, towards the end of the page. The board here discusses the ground of unpatentability based on Alpha, Cockrell, and Christensen. And then turning the page to A405, the board says, Magnum does not explain why the simple substitution of shearable threads, as taught by Cockrell, for the pins that secure the deformable release device, as taught by Lear, would not yield a predictable result. So there, the board is saying that it would have been obvious to exchange one release mechanism for another. So to use an insert that has threads is substitutable with an insert  The retaining pins, though, are for fastening the deformable device to the body of the plug. The retaining pins are not being used by Lear for attaching the setting tool with the plug. So what happens in the invention of Lear is that you have this deformable release device, and it attaches the setting tool to the body. And then underneath the deformable release device you have these pins that are screwed in that attach the deformable release device to the body. And so this whole mechanism keeps everything in place because the whole point of the setting tool is to keep the plug on the setting tool while it goes down the hole. And then once the plug is set, the setting tool's function is over. You have to get rid of it. Lear just teaches one release mechanism for releasing... Where in the record is there expert testimony to that effect? Because at the institution decision, to rely on the institution decision where all you had was generalized statements with no evidentiary support, and then you shift the burden to the patent holder to disprove just these generalized statements, that's clearly not consistent with what the board's analysis is supposed to be in an obvious misdetermination. There was evidence in the record. And if we go to... If I could direct the court's attention to Dr. Woolley's declaration at A285, starting at paragraph 73. There he says, I was aware of bottom-set plugs and knew that many different release mechanisms could be used. I was aware of both deformable elements and shear threads, and I viewed them as interchangeable with each other, with practical differences but not functional differences. So when the board said this release mechanism of Lear is easily interchangeable with the release mechanism of Cockrell, that's when the board was saying, tell me why. We have the evidence here in the record. Tell me why this doesn't give you a predictable result. Well, wait a minute. You've got one statement with no support, doesn't point to anything in the prior art, doesn't point to anything specific in the patents, and it just says, I was aware of deformable elements and shear threads, and I viewed them as interchangeable, period. Well, if we go to... Your Honor, that statement does have evidentiary support. If you go to A253 at paragraph 34, Dr. Woolley there says that, at the time of the invention, I recognized, this is paragraph 34, others having ordinary skill in the art recognized that a shear ring that deforms by shearing at a predetermined axial force was equivalent to and interchangeable with threads that deform. And then he recites all these patents in the prior art that show using threads to detach one element from another was well known to the skilled artisan. But he doesn't refer to anything to say that you should make this change, and the requirements of the law is that you need something in the prior art to suggest that this change should be made. Instead he says, well, what they did I could have done. Well, he does suggest a rationale for changing it, and this is at A... What authority? Not that he, in his head, looking retrospectively at what this inventor did, but where is the prior art suggestion that this change should be made? So, in Christensen, and this is... He uses the disclosure of Christensen to suggest that someone skilled in the art would have been motivated to make this change because... But didn't make it until this inventor made it. Turns out, apparently, it's superior, or else the petitioner wouldn't have cared, and we're told has made some sort of arrangement, we don't know what, so that he's no longer affected by the decision here. Your Honor, I... There's been no evidence in this record that it is superior. They haven't relied on secondary considerations. But putting that aside, Dr. Woolley testified without challenge that a skilled artisan would have been motivated to replace, to use an insert as disclosed by Christensen as a single element, and I believe this court's case... But his whole appeal is the challenge to the obviousness of making that change. I'm sorry? The fact that he was allowed as the expert to testify without being interrupted is not to say that the patentee agreed with every word that he said. I understand that, but they had the opportunity to depose Dr. Christensen, they had the opportunity, the patent owner had the opportunity to submit statements about the deposition to the board, but the board looked at the declaration of Dr. Woolley and compared it to the declaration of Mr. Trahan and decided that the declaration of Dr. Woolley was more credible. The problem I have is that you're doing a thorough job of showing us lots of different things in the record, but ultimately we're supposed to review the board's decision and try to understand what was the board's rationale, and that's the problem I have right now. I can't... When it proposed the combination of the various references to come up with the claim of invention, to me it looks like it rested the substitution theory on substituting the retaining pins for the shearing threads of Cockrell, and if that's the board's rationale, I still don't see how that matches up with the claim limitation. I understand, Your Honor. Do you agree with me that that is the pivot point, the key to the board's decision on modifying the primary layer reference? It is to replace and substitute retaining pins for these shearing threads from Cockrell? No, I don't. Okay. They said it three times. I think I agree with you. They said it three times? I agree with you. It's not as precise as it could have been. If you look at the sentence that you're referring to, is it A23 at the two-thirds of the way down? And then A27 as well. Yes, and they say, again, Magnum does not explain why the simple substitution of shearable threads as taught by Cockrell for retaining pins that secure the deformable release device as taught by Lear would not yield a predictable result. It would have been more clear if they said four retaining pins and a deformable release device. But if you take it together and you look at the entire record, the record is replete that changing one using threads or using shear pins or using any other mechanism, these were all well known in the art, and they were all well known to be interchangeable. But wait, even if it's true that the PTO can intervene in the absence of an opposing party, the only thing the PTO can intervene to do is to defend the decision on the grounds that the board used. You can't ask us to substitute our own review of the art and use grounds that are not articulated by the board, right? I mean, even if you don't agree with the board, which I sense that you think it would have been an easier analysis or a better analysis had they done other things, but that's not the PTO's role at this point, is it? Well, Your Honor, I think the fundamental disagreement is I believe they were saying what I'm saying to you now. I think that the sentence that the court seems to have trouble with could have been written clearer. But if you look at the whole record, the board's path is discernible. But it seems like the whole path was based on a misapplication of the burden. In other words, I get someone who says you can combine this with this and you didn't disprove that. That doesn't seem to me to be an appropriate obviousness analysis. Well, Your Honor, Dr. Woolley's testimony or declaration, he speaks as someone skilled in the art at the time of the invention. He's telling us what somebody skilled in the art would have understood. He references several patents in the art, and he actually references a patent that shows that using an insert with shearable threads to remove a setting tool has been used for 50 years. That was certainly sufficient evidence to meet the prima facie case as far as the prima facie case of reasonable likelihood that the petitioner would prevail. That has to do with initiation. Once you get into the merits determination, there is no such thing as saying all we need to show is a reasonable likelihood. There's not a prima facie case analysis anymore. No, I understand that. That was our point in our intervention brief, that once you get to trial, then the whole trial opens up. At that point, we are trying to get to what are the merits of the case. At that point, it's not helpful to talk about whether they said this in their petition or whether they said that. It's helpful to, at this point, we want to know, has the petitioner carried their burden of showing by preponderance of the evidence. Standing here today, our point is that all the elements of a prima facie case or obviousness are shown in this record, and the patentee has not sufficiently rebutted them. But doesn't the board have an obligation to spell it out? I mean, you're saying the fullness of the record, you can locate all the pieces of evidence and favorable testimony to finding these claims unpatentable. But isn't there an obligation for the board to somehow package it together so that we can see their rationale? Right now, it looks like, as you said, they took a shortcut in this substitution theory of retaining pins for shearing threads. And then secondly, they took perhaps a shortcut in saying, there is one would know to substitute, but they didn't say one would know to substitute because dot, dot, dot. There's no because, I see, in the board's decision. I have to disagree that they took a shortcut. My point, standing here today, is maybe they weren't as articulate as they could have been. But what they're saying is, in the sentence that the court has issue with, we are changing, if you add threads to the deformable release device, then you don't need the pins anymore. And anyone skilled in the art would understand that because the whole point of the pins are to hold the deformable release device in place. Right, but don't you need the threads on the interior surface of the deformable device? Yes, and that's what Cockerell teaches. I know, but when you substitute the threads for the retaining pins, now you're talking about putting threads on the exterior, not the interior, of the deformable device of Lear. Yes, and Christensen is what we use to teach threads on the exterior. Right. So to hold the release mechanism into place, if you're not using pins, you need to use exterior threads. Right, but that still leaves the gap of why would anybody put threads on the interior of the Lear deformable device? Because threads are well known in the art to be used to release one element from another, as Cockerell teaches. But, all right. Okay, we need to move on, if it's all right with the panel. Okay, thank you, Mr. St. Clair. We've run way over, so let's give Mr. St. Clair 10 minutes or so if he needs it. I don't need 10 minutes, Your Honor. Okay. This should be very quick. Judge Chin, we're in agreement with your last few statements that it seems like the board took a shortcut. A lot of the argument that we just heard we feel like was not in the record, and that was the problem with the appellant feeling like we're arguing against what's essentially a moving target. The record is replete with the board using its own biased logic to replace the retaining pins of what was known in the art with sheer pins, which doing so is actually taught against in this same very primary reference. The record is devoid of any showing of how skilled artisans would have ever been motivated to do that. The record is devoid of any rational underpinning, as taught by the Enrique Kahn case on why someone— Put aside the rational, but how do you respond to the government's argument that actually the Woolley Declaration should have been enough? Well, in looking at the Woolley Declaration, it was our position that the Woolley Declaration is just full of conclusory statements without making that connection. I've deposed Dr. Woolley probably four times in the district court litigation, and when we got to this stage, we saw no point in deposing him again because we knew what his position was. Mr. Trahan, and to add on to that, Dr. Woolley has never designed a downhole tool a day in his life. He's a university professor. We rely on the technical opinion of Mr. Kevin Trahan, who's worked for the likes of Halliburton and Schlumberger, who's worked in this field for 25-plus years. He was at some point a person of ordinary skill in the art, and now he's a person of extraordinary skill in the art. From his opinion, which we believe is a lot more highly credible than that of Dr. Woolley, he says someone with a skilled artisan that is described in this record would not have reached the conclusion of combining the deformable disc of Lear with what's taught in Cockerell or Christensen. What about the idea of using Cockerell's frangible release member, that cylindrical thing, 136, and then taking out the deformable release device 30 from Lear and putting that cylindrical frangible release member 136 into Lear? Well, that could have been something that was otherwise possible. We don't feel like it was properly argued by the board or by the original petitioner in itself. And at this point, we feel like the board is attempting to fill in  in hindsight. And at this point, addressing the question that Judge Newman raised early on, we feel like the structure now of the IPR has put us in a precarious position as opposed to what the inter partes re-exam position was. In viewing the board's recent decision and Judge Newman's dissent in the Ethicon Corvidian case, we're completely in agreement that the structure the way it is now is not what Congress intended. And then on top of that, now we have the intervener stepping in in a case acting as both where the board made the decision to institute, they made the final decision with respect to invalidity, and now we have the intervener attempting to step in and add another level of adjudication where we think it's not exactly what Congress intended. That's all I have. Thank you. Okay. Any more questions for Mr. Duncan? Thank you. Thank you both. The case is taken under submission.